CHARLES CIRIACK vs. MERCHANTS' WOOLEN COMPANY.

Suffolk.    January 10, 11, 1888. — February 29, 1888.

Present: MORTON, C. J., FIELD, C. ALLEN, HOLMES, & KNOWLTON, JJ.

*Master and Servant — Personal Injuries — Negligence — Child.*

A boy of twelve years of age and of average intelligence, who had worked for nearly two months in the same room with, but not upon, certain machines, the rapidly revolving gearing of which was upon the outside and in plain sight, while obeying an order from the overseer to "go up between" the machines to look for a tool, and to "hurry up," became entangled in the gearing and was injured. *Held*, that he could not maintain an action against his employer for the injury so received.

TORT for personal injuries sustained by the plaintiff on May 29, 1872, while in the defendant's employ. Writ dated June 16, 1885. Trial in the Superior Court before *Aldrich*, J., who allowed a bill of exceptions, in substance as follows:

The accident to the plaintiff occurred in the finishing-room of the defendant's mill, a room filled with gigs, shears, and other machines, all of which were run by steam or water power. The plaintiff was injured by one of the gigs, which were cylindrical machines for rubbing up the nap of the cloth manufactured in the mill. Two of these gigs stood together in the finishing-room, with broad passageways between them and the adjacent machinery but with a distance between the bodies of the two machines of about two and a half feet, the distance between them at the narrowest point, from the cogs of one gig to the belt wheel of the other, being about one and a half feet. The gigs had on one side a belt wheel, and on the other side gearing, in plain sight, consisting of three cog wheels, each about eighteen inches in diameter, and one small cog wheel about two and a half inches in diameter running through the middle of the cylinder of the gig. The cylinder of each gig stood in an iron frame fastened to the floor by four legs, the bottom of the cylinder at its lowest point being about one and a half feet from the floor. Nothing obstructed the view underneath the cylinder, except so far as the cylinder itself did so. The cylinder, as well as the gearing, moved always in the same direction.

The plaintiff was caught in the place where the small cog wheel came in contact with the second cog wheel, being at a distance of about three and a half feet from the floor. The machine was run by a man or boy standing in front of it, by turning up or down a handle, which caused the cloth on the cylinder to go in one direction or the other, or to stop, as the case might be. The cylinder made about one hundred revolutions a minute, and the small cog wheel the same number. The machine, measuring its extreme projections, was about five feet square, and nearly six feet high. Men, women and boys were employed in the finishing-room. Some of the boys tended machines, and there were four others, among whom were the plaintiff and his older brother, whose duty it was to take cloth from an apron on the back of the finishing shears, and wheel it on trucks through the passageways to the gig-room; also, to take cloth from racks, and wheel it to the finishing shears, and sew it on to the apron. These racks were small slat platforms, about four inches from the floor, and directly in front of and within six inches of the two gigs, though they had no connection with them. These racks sometimes had cloth piled upon them to the height of three or four feet, but there was no evidence that there was any cloth upon them at the time of the accident. In a line with these racks, and at a distance of about seven and a half feet apart, were posts, which supported the floor above, and were in a line half-way between the two sides of the room, and the racks lay between or just outside of these posts. The regular way to the gig-room was through the passageways, but some of the men and boys in going to and from the gig-room sometimes went between the gigs, as a shorter cut from one room to the other. There was room enough for a man to pass, with care, between the gigs when they were running, but the space was not designed or intended for a passageway for general passing, the broader passageways being provided for that purpose. There was conflicting evidence as to how light the place was at which the plaintiff was hurt.

Charles Ciriack, the plaintiff, testified that he was born on February 23, 1860, and that the accident happened on May 29, 1872, at about ten o'clock in the forenoon. He had lived in Dedham, near the defendant's mill, most of his life, and, having

stopped going to school in 1871, went to work for the defend-
ant for a month in the spring of that year in the flock-room, a
room off of the finishing-room. He worked there on a flock
machine, which he described as having no gearing on it, and his
duty was to shovel the flocks into the machine. Before he went
into the flock-room he knew nothing about machinery. In pass-
ing into the flock-room he did not have to go near the gigs, by
one of which he was subsequently hurt, and did not know any-
thing about them at that time. After working in this room he
returned to school, and came back into the defendant's employ
in April, 1872, and worked for it nearly the whole of April
and May, down to the time of the accident. He was employed
by the superintendent, who told him that he was to do what
Craven, the overseer of the finishing-room, told him to do.
Craven took him into the finishing-room, where his brother and
other boys were working, and told him that they would show
him what to do, and left him there. These boys showed him
how to fold cloth from the gig-room off on to racks. When
a piece was wanted on one of the shears, " we would fetch it
off of this rack and hitch it on to the apron on the back of
the shears. We had to take the cloth off of the shears when it
was sheared, pull it off, fold it to same place we put it on, pull
it off on to our trucks, and wheel it through a long entry into
the gig-room, and one of the gig-room hands would help us fold
it on to racks that they had in the gig-room ; then we would
fetch back the empty truck, deposit at these racks, and put a
piece on it ready to put in the shears again. We took turns
wheeling: one would go at one, and another at another time.
The boys told me nothing else. We had nothing to do with the
gearing on the shears. The fellows who run the shears stood
behind them. The gearing runs along the side. My attention
was never called to the gearing on the gig that I got hurt on.
I never got any instructions at all outside of what the boys
minded to give me. The overseer under Craven told me one
day, when he saw me walk by a piece of lace leather on the
floor, to pick it up and carry it down and put it on the bench
where he used to have his tools, and never to let him see me
again walk by anything that was on the floor without picking
it up."

" On the day of the accident, I was coming up from the gig-room, after wheeling in a piece of cloth, and when I got up near the corner of the aisle intersecting the passageway from the gig-room, Miller, who was our 'boss,' spoke to me from the tool bench, and told me to go up between the gigs and look for his belt punch and hurry up. I brought my truck up in front of one of the racks and left it, and went round into the space between the two gigs. As I was going, my brother wanted me to put a piece on one of the shears. I told him that I would be with him in a minute. I went in between the gigs and stooped down to look underneath the gig. As I was rising up, I saw a piece of lace leather which had been left there, such as you sew a belt with; I picked that up. I could not see the belt punch. As I rose up, the gears caught my jacket sleeve above the elbow and drew in my arm. When I felt it catch the sleeve, I grabbed my arm by the wrist, but it went so fast I couldn't get it out before it was mangled."

He further testified, that he had never received any instructions from anybody about machinery or its dangers, either before or after he went into the defendant's employ, or during it, except as already shown, and that his knowledge of the parts and character of the machinery, except the flocking machine in the defendant's mill, was wholly derived from inspection of the same after the accident; that his duties in the gig-room required no connection with the machines therein, and did not require him to look at them ; that he knew the machine that he was hurt on was called a gig, but he had never troubled himself to learn its uses, or its dangers, or the manner in which it was operated ; that the duties of his job required him to devote his whole time to it; that his job did not require him to go near the gearing on which he was caught, nor into the space between the gigs, nor to look in the direction thereof ; that when he was near the gig, he was behind the revolving cylinder; that he never, in his recollection, passed into the space between the gigs, except at the time when he got caught; that the overseer directed him to hurry, and he obeyed orders ; that he did not recollect of ever passing in and out among the machines, except this one time, unless going through the broad passageways was passing in and out among the machines.

On cross-examination, he testified that when he was at work in the flock-room, and passed through the finishing-room, he had no doubt that he saw the gig there, but did not recollect about it; that the flock machines were operated by steam power; that he understood at that time that if he knew of danger anywhere he would look out not to get into it, and that he appreciated the fact that it was necessary to take care as far as he knew; that he supposed that he felt like getting out of danger if there was any; that the gig-room into which he wheeled cloth contained a large number of gigs in operation having gearings; that he probably saw these gigs in operation, but paid no attention to them, because he had nothing to do with them; that when he fastened the cloth upon the apron on the finishing shears, the machine was stopped; that there was cloth upon the racks in front of the gigs at the time of the accident, but he did not remember how much, or whether the pile was six inches or three feet high; that the machine at which he was hurt was in operation at the time he was injured; that he could not say whether he did or did not know that it was in operation before he went in there; that he could not say that when he stooped down he did not see that the machine was in operation; that he would not say that he did not see it in operation, but could not recollect; that he had no doubt that the cylinder was going round, but did not believe that he took any notice of it; that he walked into the space between the two gigs close up to the machine, and that he did not believe that he looked at the machine or took any notice whether it was in operation; that he was in a hurry after the belt punch, which he was directed by the "boss" to get, and that he believed that that was the only thing that he had on his mind when he went in there; that there was some cloth dust or "flocks" on the floor under the gig, but how much he could not say; that at the time of the accident he was about the average height of boys of twelve years of age; that he could look under the machine without difficulty, but that it was necessary to stoop; that he did stoop down on the floor as far as he could get with his hands to the floor; that when he stooped he was probably within about a foot of the gears; that he might have been nearer; that he did not recollect whether he took notice before he stooped whether they

were running or not; that when he got down on his hands on to the floor, he did not see the belt punch; that he could not say that during the week that he had worked in the finishing-room he had learned to look out for machines in operation, though no doubt he intended to keep out of such danger as he then appreciated; that he now supposed that he then thought that there was danger around the belts and such places, but that he did not believe that he then knew enough about them to know whether the danger was in them; that he had no doubt that he had seen the gearing; that he did not know as he had ever thought anything about the effect of his exposing his person or his clothing to contact with it, but that he knew enough at that time not to put his hand or his clothing into wheels in operation; that if he had seen the wheels revolving at the time, he believed that he would not have intentionally let his hand, or his arm, or his sleeve get in; that if he had noticed that the wheels were revolving, he did not know whether he would have known enough when he rose not to come into contact with them, and thought that he did not know that there was any danger in them at the time; that he did not believe that when he went in there he knew that there was gearing on the gig; and that he did not get hurt in consequence of putting his hand into the cylinder to play with a piece of string, and by his arm being suddenly thrown back against the gearing.

Miller, the "boss" referred to, died before the action was brought. Other witnesses for the plaintiff testified that the plaintiff possessed the average intelligence, and was as careful as the other boys.

Michael Craven testified, for the defendant, that he was overseer of the finishing-room until a day or two before the accident; that the plaintiff was a smart, bright boy; that he had seen the plaintiff as well as the other boys passing in and out among the machines; that there were no restrictions put on the boys about going in through them; and that there was plenty of room to get through. Frederick Bradley testified, that he was employed by the defendant at the time of the accident; that he asked in plaintiff's presence how the accident occurred, and some one said that the plaintiff was fooling with the machine, and the plaintiff said nothing. Mary Sullivan testified that she worked for the

defendant in May, 1872, and "saw the plaintiff put his hand out towards the machine, as if he were picking something from some part of the machine. I happened to look up from my work and saw this, and then looked down and did n't see him again." William J. Kennedy testified that he "was in defendant's employ. At the time of the accident, I was in the finishing-room. Saw plaintiff in front of the gig. He was pulling something off the cylinder. It did n't suit him. He got round on the side, and undertook to catch it there. In catching it, he ran his arm up that way, followed it up the cylinder round this way, towards him, and the gears run this way too, and he followed it, and his arm went in."

The defendant asked the judge to rule that there was no evidence which would warrant a verdict for the plaintiff, which ruling the judge declined to give. The jury returned a verdict for the plaintiff for $8,000; and the defendant alleged exceptions.

*R. M. Morse, Jr., & H. G. Nichols*, for the defendant.

*H. W. Bragg & E. Greenhood*, for the plaintiff.

1. An employer must see that servants are properly warned of the dangers of the place in which they are put to work, and is not relieved of responsibility for the consequences of a failure on their part to receive such warning by any delegation of the duty to warn to any agent or overseer, or by a neglect on the latter's part to give such warning. *Gilman* v. *Eastern Railroad*, 13 Allen, 433, 441. *Coombs* v. *New Bedford Cordage Co.* 102 Mass. 572, 599. *Wheeler* v. *Wason Manufacturing Co.* 135 Mass. 294. *Grizzle* v. *Frost*, 3 F. & F. 622. The sufficiency of the plaintiff's experience, as well as of his age and judgment, to relieve the defendant of the duty of giving him notice, was a question for the jury.

2. This court has sustained a verdict as to due care in a case disclosing evidence of a far less favorable character. *Coombs* v. *New Bedford Cordage Co., ubi supra*. The undisputed evidence reported must conclusively show contributory negligence on the part of the plaintiff, considering all the admitted or undisputed facts in the case, including the age, experience, and intelligence of the plaintiff and the danger to which he was exposed, and the means of knowledge afforded to him, to justify the court in taking the case from the jury on the question of due

care. *Lane* v. *Atlantic Works*, 107 Mass. 104, 108. *Tyler* v. *New York & New England Railroad*, 137 Mass. 238, 242.

When the circumstances under which the plaintiff acts are complicated, and the general knowledge and experience of men do not at once condemn his conduct as careless, it is plainly to be submitted to the jury. What is ordinary care in such cases, even though the facts are undisputed, is peculiarly a question of fact to be determined by the jury under proper instructions. The refusal of the judge to withdraw the case from the jury cannot in any case be construed as an indication that in his opinion the jury ought to find in the plaintiff's favor upon this question. *Gahagan* v. *Boston & Lowell Railroad*, 1 Allen, 187. *Warren* v. *Fitchburg Railroad*, 8 Allen, 227. *Meesel* v. *Lynn & Boston Railroad*, 8 Allen, 234. *Reed* v. *Deerfield*, 8 Allen, 522. *Fox* v. *Sackett*, 10 Allen, 535. *Gaynor* v. *Old Colony & Newport Railway*, 100 Mass. 208, 212.

In a case of a boy thirteen years of age who incited a dog to bite him, the court held that the test is, " Would the injury have been prevented if the boy had exercised the thoughtfulness of one of his age, at the moment, without stopping to reflect ? " *Plumley* v. *Birge*, 124 Mass. 57.

The evidence showed that the plaintiff exercised the care which might be expected of a boy of his age and experience under the circumstances disclosed by the evidence.

See also Wood, Master and Servant, 880, 886 ; *Cayzer* v. *Taylor*, 10 Gray, 274, 281, 282 ; *Munn* v. *Reed*, 4 Allen, 431 ; *Snow* v. *Housatonic Railroad*, 8 Allen, 441 ; *Carter* v. *Towne*, 98 Mass. 567 ; *Lane* v. *Atlantic Works*, 107 Mass. 104 ; *Ford* v. *Fitchburg Railroad*, 110 Mass. 240, 259 ; *Murley* v. *Roche*, 130 Mass. 330 ; *Johnson* v. *Boston Tow-Boat Co.* 135 Mass. 209, 211 ; *O'Connor* v. *Boston & Lowell Railroad*, 135 Mass. 352 ; *Railroad Co.* v. *Fort*, 17 Wall. 553 ; *Siegel* v. *Schantz*, 2 Th. & C. 353 ; *Mann* v. *Oriental Print Works*, 11 R. I. 152 ; *Lalor* v. *Chicago, Burlington, & Quincy Railroad*, 52 Ill. 401 ; *Grizzle* v. *Frost*, 3 F. & F. 622 ; *Somerville* v. *Gray*, 1 Ct. of Sess. Cas. (3d series) 768 ; *Morton* v. *Edinburgh & Glasgow Railroad*, 2 Ct. of Sess. Cas. (3d series) 589 ; *Murphy* v. *Smith*, 19 C. B. (N. S.) 361.

C. ALLEN, J. In order to show negligence on the part of the defendant, the plaintiff relies on the omission to give him suitable

instructions in reference to the dangers to which he would be exposed in the course of his employment. His injury arose from coming in contact with the revolving cog wheels of a machine; and the instructions which he was entitled to receive must therefore have been concerning the danger from that cause. But it seems to us that it must fairly be assumed that the plaintiff had all such knowledge as it was the duty of the defendant to impart to him. There was no peculiar or secret source of danger. Anybody seeing the machine in motion must soon become aware of the danger which would arise from coming in contact with it. The duty of the defendant would be sufficiently discharged by pointing out to the plaintiff the situation of the machine, and the rapid revolution of the wheels when in operation, and explaining the probable effect of touching them under these circumstances. Certainly the duty of the defendant did not extend so far as to require the giving of a special caution on every occasion when he might be called upon to pass near the machine. The master is only bound to give such instructions as are reasonably necessary in order to enable the servant to understand the perils to which he is exposed by reason of his employment. A servant is held to take the risk of such dangers as are known and understood.

In the present case, the duty of the defendant to the plaintiff would not require an explanation of anything which he already sufficiently understood. In order to show actionable negligence on the defendant's part, it was incumbent on the plaintiff to show an omission to inform him of something which he needed to know in order to be safe. *Sullivan* v. *India Manufacturing Co.* 113 Mass. 396. In the absence of anything to show the contrary, the plaintiff must be assumed to have had the intelligence and understanding which are usual with boys of his age. There is nothing to show that he did not know the danger of coming in contact with the revolving wheels of the machine. It must be assumed that he was well aware of it. The accident happened in consequence of his omitting to guard against a known peril. He had been employed in the same room for a period of nearly two months. There is no reason to suppose that explicit instructions, if given to him at the beginning of his employment, in reference to the danger of touching these wheels when in motion, would

have added anything to what he must fairly be presumed to have known at the time of the accident.

It would be carrying the doctrine of holding employers to the duty of giving reasonable instructions to their servants quite too far, to require a special caution every time a boy is sent on an errand, under circumstances like those disclosed in the present case. The injury appears to have arisen from a lack of sufficient precaution on his part, and not from the negligence of the defendant. *Russell* v. *Tillotson*, 140 Mass. 201. *Williams* v. *Churchill*, 137 Mass. 243. *Wheeler* v. *Wason Manufacturing Co.* 135 Mass. 294.

In *Coombs* v. *New Bedford Cordage Co.* 102 Mass. 572, 598, which is chiefly relied on by the plaintiff, the plaintiff had been at work for the defendant only one day, and under these circumstances the evidence of the nature of the work, and of the position in which he was to do it, were considered to warrant the jury in finding that the plaintiff was manifestly incapable of understanding and appreciating the dangers to which he was exposed by the gearings, or manifestly incapable of performing the work there with safety.

In the present case, we are of the opinion that there was no sufficient evidence of negligence on the part of the defendant.

*Exceptions sustained.*