JOHN M. GOODNOW *vs.* WALPOLE EMERY MILLS.

Suffolk.     January 18, 1888. — March 2, 1888.

Present: MORTON, C. J., DEVENS, HOLMES, & KNOWLTON, JJ.

*Master and Servant — Negligence — Personal Injuries.*

A machinist and engineer, who undertakes extra work for extra pay, first examining the place and receiving particular directions, within three feet of a rapidly revolving shaft, which he knew was in operation, and is caught by a set screw projecting from a collar on the shaft next a journal which he had once before oiled, the screw being of a kind in common use, with the nature and use of which he was familiar, cannot recover from his employer for an injury so received.

TORT for personal injuries occasioned to the plaintiff while in the defendant's employ. At the trial in the Superior Court, before *Aldrich*, J., there was evidence tending to prove the following facts:

The plaintiff was employed in July, 1881, to take charge of and run the engine and pumps in the defendant's mill by one Way, its superintendent. The plaintiff was injured on October 20, 1881, by being caught upon a set screw projecting about one inch from the collar of a two and a half inch smooth shaft, the collar being three inches broad and fixed on a shaft contiguous to the box or journal holding the end of the shaft, and the set screw being in the middle of the collar. The set screw had a square head with four sharp corners, and was within about two inches of the box or journal, which was hung vertically, the box being sixteen inches long, six inches wide, and six inches deep. The collar and set screw were about three feet from the stamp which the plaintiff was repairing when injured.

The plaintiff testified in substance as follows: I am thirty-seven years old. On the night of October 19, 1881, I had been running the engine from six o'clock P. M. till six A. M., and Mr. Way asked me if I would help fix the stamp under his direction. I said I would. He told me what he wanted done, and how he wanted it done; that he wished to take out the lining and put in a new one. I had never done it before, and knew nothing about how it was to be done, except as I was told by Mr. Way. He told me this the morning of October 20. I left work at six o'clock A. M., went to breakfast, and returned about seven or a little after Found Mr. Way in the yard. He asked me if I was ready to go to work, and help put the linings in. He went in and showed me what he wanted done and what had got to be done. I was never in the place where I was put to work before, that I know of; there was nothing in my duty which called me there, and no occasion for me to be there at all in my work. I had put a cylinder head in the steam cylinder and adjusted the valve upstairs before that; can't tell how long before. In doing that I would go through the engine-room and stamp-room. On October 20, Scott and Morissey were there helping me put in the lining all the time; and Mr. Way was there part of the time. I was at work in the stamp-room, in front of the mortar here. Scott from above lowered the lining down, and it was partly in the mortar, and Morissey and I were pushing it in. I stepped down, put my shoulder underneath the corner to push the lining in, and I was caught. [The witness illustrated with a model the manner in which he did this.] At that time I did not know anything about any set screw being on the shaft; never had any intimation of any such thing. There was nothing in my duties which would require me to see it, or know it was there, or to call my attention to it; the next thing that I knew I was going round with the shaft. When I first felt the pull I hollered to Joyce to shut down the engine. The shaft was revolving about one hundred and seventy times a minute, as I estimated by the speed of the engine and the size of the wheels and pulleys. I had on my under-flannels and a pair of pants, a workingman's striped shirt, overalls, and a frock or jumper. The overalls and jumper were made out of blue drilling. The jumper came about to my waist. This is

the dress I usually wore, — the dress that workingmen usually wear.

On cross-examination, he testified: Before I went to work for the defendant I had run the engine at the Union Straw Works for three seasons, commencing in the fall and shutting down in the spring. My duties as engineer at the Straw Works were to take care of the engine and the steam. I took the whole charge of the engine, kept it in ordinary repair, and oiled it. I had charge of the engine in the defendant's mill from the time I went there, and as engineer my duty was to keep it in ordinary repair, oil it, and make the steam. While there, and while in the employ of the Straw Works, I had learned that it was not expedient to go near machinery while in operation without using due care. I presume I could have stopped the shafting. I don't know whether I could have stopped the engine that morning while doing this work if I had wanted to do so. I was not asked whether it was not best to stop the engine. I knew that the shaft was revolving when I went to work there. I was standing within a very few feet of the revolving shaft; I knew the shaft was revolving because the engine was running. I don't know whether I looked out to see whether the shaft was revolving or not. I calculated to keep a safe distance from it. I think sixteen, eighteen, or twenty inches would be safe. Should not intend to get nearer than sixteen inches to it. I was led to go so near the shaft to get my shoulder under the lining. The side I was pressing to put in was the side farthest from me. My movement would depend upon whereabouts the lining was; it was suspended over the mortar down through the centre; the movement I was going to make was to throw it over to the side of the mortar farthest from the shaft, to put it in there. My tendency would be to keep a lining of two or three hundred pounds clear of all iron so it would not rub; my whole movement would not have been towards the shafting. In moving to put the lining into position, my movement would be away from the shafting; the farther the lining was pushed in, the farther from the shafting I would go. The lining was not in the mortar; one corner of it rested on the bar, and I was going to put it in. I never attempted to account for my being within two or three inches, or four inches, of the shafting while doing the work. I

can't tell or recollect anything that required my getting within six inches of the shaft. I filled the oil cups on the hanger near the set screw once; it was not my business, and I can't say when I was in the engine-room; I smelt a hot box, and went from the engine-room and filled these oil cups. The shaft was revolving at the time, and I held my hand up near to the cups. It was in the daytime, I think; I can't tell how long before the accident. It was the business of Joyce, who ran the stamp overhead, to keep these cups filled. The oil cups were out of the engine-room. The collar in which was the set screw was next to the hanger; the object of it is to keep the shaft from working back and forth, so that, if there was another hanger beyond, you would have another collar to keep it steady; the collar is kept in place by the set screw. I had seen set screws in my life, and know what the object of set screws is; they are very common in machinery. There would be four or five on the engine; I could not tell how many on it. I could by stopping to think of the different parts. If I had stopped the engine, the accident would not have happened. I have no recollection when I filled the oil cups of how near my hand was to the shaft. The accident occurred about noon. I was working on extra time. I had worked whole time the night before. I agreed to come this morning, as extra work, and did come.

William A. Morissey testified for the plaintiff in substance as follows: I was in the employ of the defendant at the time the plaintiff was injured, as general workman. The stamp-room was eight or nine feet high; it is lighted by the door into the engine-room, and through the belt holes and the window. The window was about opposite the stamp. The window had three lights, I should think eight by ten, maybe a little larger, — a common window, the same as in underpinning of buildings; about half of the window was under ground. I was present when the injury was received. Goodnow and I stood in front of the mortar putting in the lining into the inside of it. The plaintiff said, "Hold on a minute, I want to get my shoulder under there," and turned facing me and got down to lift as I lifted on the inside corner to push the lining into the mortar, and I heard him cry out, and the next I saw him going over the shaft. In the progress of the work in the forenoon, we had occasion to use the lantern just

inside the mortar, when we cleaned out the stone and took out the bolts of the old lining.

On cross-examination he testified: The platform on which the mortar stood was, I should think, two feet high above the floor, maybe more, so that, if a man was standing upon the platform, his foot would be about three feet below the main shaft. At the time of the accident, one or two planks right over the mortar were up, and some light came through that opening. There was some light upon the staircase, and the door of the engine-room was open. In the engine-room I think there are two windows in the underpinning, and three windows in the other side of the basement of the engine-room. Joyce had charge of the engine on the day of the accident. Goodnow was in charge of the work.

John Senior testified that the plaintiff was caught on the set screw.

The plaintiff offered evidence, that, in the form of set screw and collar in common use, the collar is recessed so as to allow the set screw to sink into the collar flush with the face of the collar, and that there is much less liability of being caught upon this kind of set screw and collar than upon the one upon which the plaintiff was caught; that the superintendent, Way, knew that this set screw and collar were in the place described, and did not inform the plaintiff of its existence, and that the set screw would not be noticed by one looking at the shaft in motion. There was also evidence tending to show that a person dressed as the plaintiff was could come in contact with a smooth shaft without danger, but could not come in contact with the set screw described without being caught ninety-nine times out of a hundred. The defendant offered evidence that the recessed collar described above was not in common use, and that the collar and set screw upon which the plaintiff was caught were in common use.

The judge ruled that on this evidence the plaintiff could not maintain his action, and ordered the jury to return a verdict for the defendant, and reported the case for the determination of this court. If the ruling was correct, judgment was to be entered on the verdict; otherwise, the case was to stand for trial.

*H. W. Bragg,* for the plaintiff.

*H. G. Nichols,* (*R. M. Morse, Jr.,* with him,) for the defendant.

DEVENS, J.  It was for the plaintiff to show both that he himself was in the exercise of due care, and that the injury to him was occasioned by the negligence of the defendant.  He was an intelligent man, of about thirty-seven years of age, who had been in the employ of the defendant for about three months as a machinist and engineer, employed to run the engine and pumps, and have charge of them.  He had previously been em-ployed in this business elsewhere, for three seasons, and part of a fourth, taking the whole care of the engine, and keeping it in ordinary repair.  On the day of the accident he had been asked by the superintendent of the defendant's works to repair a stamp under his direction.  The superintendent told him " what he wanted done, and how he wanted it done," which was by taking out the lining of the mortar and putting in a new one.  The plaintiff assented, and when ready to go to work the superintend-ent " went in and showed " him " what he wanted done, and what had got to be done."  The plaintiff took charge of this job voluntarily.  It was not in the regular line of his employment, but was extra work, for which he was to receive extra compen-sation.  The engine was in motion, a shaft passing through the " stamp-room," as it was called, and revolving at the rate of one hundred and seventy times a minute.  A set screw projected about an inch from the collar of the smooth shaft, which collar was about three inches broad, and fixed on the shaft contiguous to the box or journal holding the end of the shaft.  The set screw was in the middle of the collar, and kept it in its place. The plaintiff was at work about three feet from this set screw, upon the platform on which the mortar was placed.  He de-scribes the accident as follows: " I was at work in the stamp-room in front of the mortar here.  Scott, from above, lowered the lining down, and it was partly in the mortar, and Morissey and I were pushing it in.  I stepped down, put my shoulder underneath the corner to push the lining in, and I was caught. [The witness illustrated with a model the manner in which he did this.]    At that time I did not know anything about any set screw being on the shaft ; never had any intimation of any such thing.  There was nothing in my duties which would require me to see it or know it was there, or to call my attention to it ; the next thing that I knew I was going round with the shaft."  From

his own testimony, it further appeared that the plaintiff knew perfectly the object of set screws, which are very common in machinery, and of which there were four or five on his engine. He knew also the danger of revolving machinery, and intended to keep at a safe distance from it. He stated that he knew that the shaft was revolving, and "presumed" that he could have stopped the engine, in which event the accident could not have occurred. The plaintiff did not intend to get within sixteen inches of the shaft, nor could he tell how it happened that in stepping back he got so near the shafting as he did, especially as in moving to put the lining into position his movement would be away from the shafting. Nor, as he testified, could he see any reason why he should have got within six inches of it.

The plaintiff contends upon these facts, that the defendant did not furnish him a suitable place in which to do his work, nor apprise him of the danger to be apprehended from the revolving set screw, which was not in any way connected with the work which he had in hand. But the plaintiff was before familiar with the place in which the work was to be done; he had examined it the same morning, before commencing his work with the defendant's superintendent. He had also, as appears from his statement, at a former time oiled the shafting at the very journal close to which was the set screw by which he was caught. Even if he had not then observed the set screw, or had not seen it on the morning of the accident on account of the revolution of the machinery, or for any other reason, he knew as an engineer that set screws were in constant use, and that from the purpose for which they were employed it might be expected that the collar would be kept in its position by one. There was no danger which, in view of the plaintiff's knowledge and capacity, must not have been well understood by and apparent to him, and there was therefore no negligence on the part of the defendant in exposing him to it. *Coombs* v. *New Bedford Cordage Co.* 102 Mass. 572. *Sullivan* v. *India Manufacturing Co.* 113 Mass. 396. *Russell* v. *Tillotson,* 140 Mass. 201. *Taylor* v. *Carew Manufacturing Co.* 140 Mass. 150.

It cannot be claimed that the machinery used by the defendant was out of repair, or defective and unsuitable for the purpose. There was evidence on the part of the plaintiff that a recessed

collar was in common use, so made that the set screw was sunk into the collar flush with its face, upon which there was much less liability of being caught than on that used by the defendant. But the plaintiff offered no evidence that the collar and set screw as used by the defendant were not also in common use, while affirmative evidence on this point was offered by the defendant.

As we are of opinion that the plaintiff has failed to show any sufficient evidence of negligence on the part of the defendant, it is unnecessary to inquire whether he has shown that he himself was in the exercise of due care.        *Judgment on the verdict.*