JOHN ROONEY *vs.* SEWALL AND DAY CORDAGE COMPANY.

Suffolk.   December 4, 1893. — March 28, 1894.

Present: FIELD, C. J., ALLEN, HOLMES, KNOWLTON, MORTON, LATHROP, & BARKER, JJ.

*Personal Injuries — Master and Servant — Dangerous Machine — Risks of Employment — Action — Evidence — Custom.*

When a person enters the service of another, he impliedly agrees to assume all the obvious risks of the business, including the risk of injury from the kind of machinery then openly used; and it is immaterial whether he examined the machinery before making his contract or not.

If the proprietor of a factory has in use a projecting set screw for holding the collar on a shaft upon which is a pulley, although there is a safer kind of set screw in common use, he owes no duty to a person entering his employ to box the pulley or shaft, or to change the set screw for a safer one.

A person who was over forty years old and had had considerable experience was employed in a factory to haul piles of soft, loosely coiled hemp along the floor

through a narrow space between a machine and rows of this hemp. The machine was all boxed in except the end of the shaft and two pulleys thereon projecting from one side. One of the pulleys was fixed tight to the shaft, and the other was loose and held in place by a collar flush with the end of the shaft, and fastened by a set screw. The screw and shaft stood about three and a half feet from the floor, and were left exposed. The collar and end of the shaft were round and smooth, but the set screw had a sharp-cornered square head, and stood out perpendicularly from the collar about an inch. He did not know of the set screw, which could not be seen when the shaft was revolving, but was plainly visible when the shaft was at rest; but he was well aware of the danger from the moving pulleys and shaft. While passing the machine in performing his work, he came in contact with it and was injured. *Held*, that he could not maintain an action against his employer for the injury.

In an action for personal injuries occasioned to the plaintiff, while employed in the defendant's factory, by coming in contact with a machine having a dangerous device, which was in use when he entered the employment, evidence of a custom in other factories using similar machines to guard the device is immaterial.

TORT, for personal injuries occasioned to the plaintiff, while in the defendant's employ, by the alleged negligence of the latter. Trial in the Superior Court, before *Thompson*, J., who allowed a bill of exceptions, in substance as follows.

There was evidence from the plaintiff that, at the time of the accident, his work consisted in hauling piles of soft, loosely coiled hemp along the floor, from two machines called " breakers," to four other machines called " drawing-frames " in the same room. These piles of hemp were about three feet wide, about four feet long, and varied between four and five feet in height; they were hauled along the floor by means of a long-handled hook, which the plaintiff fastened at the bottom of the pile near the floor, and which he held in his right hand, while by getting a hold with his left hand in the hemp about two thirds of the way up from the floor, so as to keep the pile from falling, he walked backwards, dragging it along the floor. Each of these drawing-frames required twelve or fifteen of these piles of hemp at the same time to keep it in operation. These piles were arranged in front of each machine in rows, with three piles in each row, or, taking the rows lengthwise, four or five piles in each row. A different grade or quality of hemp was used by each of these machines. The plaintiff did not know the different grades or qualities himself, but took his information in this regard from the employees in charge of the breakers, from time to time, as required. When each drawing-frame had its full set, it was the

plaintiff's work to leave spare piles in places assigned for them, convenient to each drawing-frame, so that, as the piles ran out, the employees attending the drawing-frames might have these spare piles at hand as required.    The plaintiff had no charge or care of any of these machines.

. Between the breakers on the one side, and the nearest drawing-frame on the other, there stood a cylindrical machine called a " topper," which was all boxed in except the end of the shaft and two pulleys thereon, projecting from the side next to the first drawing-frame.    One of these pulleys, next and close to the machine, was fixed tight to the shaft; the other pulley was loose, and was held in place by means of a collar flush with the end of the shaft, and the collar was held in place by means of a set screw.    This set screw and shaft stood about three and a half feet from the floor, and were left exposed.    The collar and end of the shaft were round and smooth, but the set screw had a sharp-cornered square head and stood out perpendicularly from the collar about an inch.    This machine received its power by means of a belt running from a large pulley on a revolving shaft overhead near the ceiling to this shaft and by a tight pulley as described at the side of the machine.    Alongside of this first drawing-frame, and about seven or eight feet back from the topper, was a space about three feet wide, and room for three or four spare piles of hemp in a row, and in this space the plaintiff, by direction of one Stickmyer, who was superintendent of that room, was accustomed to leave so many spare piles for this drawing-frame. When the topper was not in operation, there was an open way in front of it by which he hauled these spare piles of hemp to this space for the first drawing-frame.    When the topper was in operation, this way was closed with hemp for use on the machine, and the only way left to reach it was through a narrow space, three or four feet wide, between the topper and the row of hemp piles set in front of the first drawing-frame.

About three weeks after the plaintiff began this work, and three days before the accident, the topper was set in operation for the first time during the plaintiff's employment, and, finding the way by which he was accustomed to haul the spare piles for the first drawing-frame closed, he asked Stickmyer, who was present at the starting of the topper, how he should go, and

Stickmyer directed him to haul these spare piles through the narrow space between the topper and rows of hemp set before the first drawing-frame. This the plaintiff succeeded for the first two days in doing without any accident, by crowding back with his feet the outside row of hemp set in front of the drawing-frame on one side as he passed, and avoiding the belt and revolving pulleys of the topper on the other. On the morning of the third day, as he was hauling either the first or second spare pile of hemp along this space between the topper and line of hemp in front of the first drawing-frame as directed, and just as the pile he was hauling got opposite the shaft or centre of the pulleys, his left hand, about two thirds of the way up in the pile, was suddenly twisted up in the hemp, throwing him bodily about six feet back, and leaving him sitting on the floor clear of the hemp, and facing the topper, with his left forearm torn off below the elbow.

On cross-examination, the plaintiff further testified, among other things, as follows: " I was coming down with this pile of hemp, having the hook in the bottom part, and this left hand about three parts of the way up the pile to keep it steady, from capsizing, watching those pulleys and the belt that I seen was going, to keep the pile as careful as I could and watch that it did n't come nigh the pulleys or the belt. I could see them going, and when I came down my arm got caught in the hemp. I was backing down. I was watching the pulleys and watching the pile of hemp, for fear my pile of hemp would cant in towards the pulleys. I was watching to protect the hemp from the pulleys. I was watching to protect myself as well as the hemp. I was watching the hemp for fear it would capsize, and keeping clear of the pulleys too. I was watching to keep clear myself and watching the pulleys, pulling backwards. There might be some danger if I got caught in the belt."

The plaintiff also testified that he had been a common sailor for about twenty-eight years of his life, going to sea when fifteen years of age, and had little or no knowledge or experience about machinery; that in 1887 he procured a situation as a laborer for the defendant at another factory since torn down, and continued at that work for about three years; that during part of

these years his work consisted in taking oiled hemp after pass-
ing through a machine called an "oiler," and piling it up where
it was taken to the breakers, but he never had charge of and
never had cleaned nor helped to clean any machines; that he
then went to sea again for a year as a common sailor; that about
four weeks before this accident, which occurred on July 13, 1891,
he again procured work of the defendant; that the first week of
this service he spent in opening knots of hemp, and piling it up
as it came from the bales, a temporary employment; that about
three weeks before the accident he was set to the work at which
he was injured; that he never knew of the set screw or collar
on the shaft of the topper, and had never heard of a set screw or
collar, and did not know the purpose or use of a set screw or
collar until after the accident; that he could easily see the belt
and pulleys as he was passing, and at the time in question he
was careful and tried to avoid them, and noticed as he was pass-
ing, and immediately after being thrown, that none of the hemp
caught in the belt or pulleys; and that no one had warned him
of any danger, and he did not know of his own knowledge what
caused the accident.

. John F. Foley testified that at the time of the accident he
was tending and in charge of the topper; that Stickmyer set
him to work on it, and it had been in operation only between
two and three days at the time of the accident; that he was not
looking at the plaintiff the moment the accident happened, but
felt a sudden jerk on the machine, and, leaning to the side where
the belt and pulleys were, saw the plaintiff seated on the floor
against a pile of hemp facing him, and the stump of his left arm
sticking up in a fixed position, bleeding; that he saw the hemp
scattered around the floor about his machine; that there was no
hemp on or about the belt or pulleys or shaft; that he stopped
working and went away from the machine for five or six minutes;
that about ten or fifteen minutes after the accident Stickmyer
brought him a wrench with which to take the pulleys off the
shaft; that he then found that the collar and set screw were off
the shaft, and, without the use of the wrench, took the pulleys
off with his hands; that prior to working on this machine he
had worked on another topper in the same room; that he cleaned
the machine once every day, and was familiar with its construc-

tion; that the set screw and collar were in place to keep the loose pulley on the shaft; that dust and dirt from the machine accumulated about them; and that the pulleys and shaft revolved rapidly, making about fourteen or fifteen hundred revolutions per minute, and when in operation the set screw could not be seen.

M. H. Barker, who was familiar with the construction of all kinds of machinery, and the uses of set screws and collars, testified that there were two kinds of set screws. one with square head projecting from and above the collar, the other with the head sunk into and perfectly smooth with the surface of the collar; that for the purposes intended one kind was just as good and reliable as the other, only that the one with projecting head was more convenient to get at; and that at a speed of fourteen or fifteen hundred revolutions per minute a man would not be likely to notice the set screw in question.

The plaintiff then asked this witness the following question: "Suppose that that set screw and collar in the centre of that pulley are about three and a half feet high from the floor, whether or not, in factories and shops and mills where arrangements of that kind are used in a position of that kind, where persons are liable to come in contact with it, there is a custom of in any way guarding that set screw and collar, so that people or things may not come in contact with it." To this the defendant objected. The judge excluded it; and the plaintiff excepted.

The plaintiff then offered to prove by this witness that he not only did know of such a custom, but also that the custom was in such case to either box it all in, or use the kind of set screw which is sunk into and smooth with the surface of the collar. The judge excluded the evidence; and the plaintiff excepted.

Patrick Hallion, an expert, familiar with the building and construction of machinery, testified that a set screw, such as described in this case, on a shaft making fourteen or fifteen hundred revolutions per minute, could not be seen, and could not be seen if making only five hundred revolutions per minute. He also testified in regard to the two kinds of set screws in use as did the preceding witness; and that both kinds were equally effective for the purpose intended.

Edward J. Rockett, who was an expert as to the construction of machinery, testified that there were several kinds of set screws, principally the projecting head, and the kind sunk level with the surface of the collar; that one was as effective to keep the pulleys in place as the other, and the only reason for using the projecting square head was because it was handier to get at; and that there could have been one of those recessed set screws flush with the collar in this case.

The plaintiff then offered to prove by this witness, and by the witness Hallion, that there was a custom of guarding a set screw situated as the one described in this case, either by boxing it up, or by using the kind of set screw sunk level with the collar. The judge excluded this evidence; and the plaintiff excepted.

At the request of the defendant, the judge ruled that there was no evidence for the jury; and ordered a verdict for the defendant. The plaintiff alleged exceptions.

The case was argued at the bar in December, 1893, and afterwards was submitted on the briefs to all the judges.

*J. A. McGeough*, for the plaintiff.

*J. W. Cummings & E. A. McLaughlin*, for the defendant.

KNOWLTON, J.   When the plaintiff entered the defendant's service, he impliedly agreed to assume all the obvious risks of the business, including the risk of injury from the kind of machinery then openly used. It is not material whether he examined the machinery before making his contract or not. He could look at it if he chose, or he could say, " I do not care to examine it; I will agree to work in this mill, and I am willing to take my risk in regard to that." In either case. he would be held to contract in reference to the arrangement and kind of machinery then regularly in use by his employer. so far as these things were open and obvious, so that they could readily be ascertained by such examination and inquiry as one would be expected to make if he wished to know the nature and perils of the service in which he was about to engage.

A projecting set screw is a common device for holding the collar on a shaft, although there is a safer kind of set screw in common use. Under its contract with the plaintiff the defendant owed him no duty to box the pulley or shaft, or to change

the set screw for a safer one.   *Coombs* v. *New Bedford Cordage Co.* 102 Mass. 572.

It is contended by the plaintiff that the defendant was negligent in not warning him of the danger.   The rule of law invoked by the plaintiff applies only when there is a danger known, or which ought to be known, to the employer, of which the employee through youth or inexperience is ignorant, and which the employee cannot reasonably be expected to discover by the exercise of ordinary care.   In this case, although the set screw could not be seen when the shaft was revolving, it was plainly visible when the shaft was at rest; and while the screw doubtless increased somewhat the danger of being caught by contact with the shaft, belt, or pulleys, that danger was so obvious to every one, and was manifestly so great, that even the most ignorant person would endeavor to keep away from those parts of the machinery.   The collar and set screw did not project much beyond the pulleys and belt, but were almost in their line of motion.   Although the plaintiff says he did not know of the set screw, his testimony shows that he was well aware of the danger from the moving pulleys, belt, and shaft.   He says in a variety of forms of expression that he was doing the best he could to keep clear of the pulleys, and that he was watching to protect himself as well as the hemp.   He was more than forty years of age, and had had considerable experience.   There is nothing in the case to indicate that he needed any warning of the danger from coming in contact with this rapidly revolving machinery, whether he knew of the set screw or not.   Indeed, if the defendant had warned him, he would merely have been told that there was great danger of getting caught if he came in contact with that part of the machinery, and that he must use his best effort to avoid it.   But it is evident that he knew all that without warning.   It has been held in many similar cases that the accident was not imputable to negligence of the defendant. *Russell* v. *Tillotson,* 140 Mass. 201.   *Ciriack* v. *Merchants' Woolen Co.* 146 Mass. 182, and 151 Mass. 152.   *Goodnow* v. *Walpole Emery Mills,* 146 Mass. 261.   *Crowley* v. *Pacific Mills,* 148 Mass. 228.   *Coullard* v. *Tecumseh Mills,* 151 Mass. 85.   *Pratt* v. *Prouty,* 153 Mass. 333.   *Tinkham* v. *Sawyer,* 153 Mass. 485. *Henry* v. *King Philip Mills,* 155 Mass. 361.   *De Souza* v. *Stafford*

*Mills,* 155 Mass. 476; *Rood* v. *Lawrence Manuf. Co.* 155 Mass. 590. *Carey* v. *Boston & Maine Railroad,* 158 Mass. 228. *Hale* v. *Cheney,* 159 Mass. 268.

The evidence of custom in other factories was immaterial. Assuming that it might have been competent as tending to show negligence of the defendant if the accident had happened to one there by invitation to do business with the defendant, it was of no consequence in view of the plaintiff's implied contract to work with the machinery which the defendant was then using.                                          *Exceptions overruled.*