FRANK DUFFY *vs.* NEW YORK, NEW HAVEN, AND
HARTFORD RAILROAD COMPANY.

Suffolk.    March 12, 13, 1906. — May 17, 1906.

Present: KNOWLTON, C. J., MORTON, LATHROP, LORING, & BRALEY, JJ.

*Negligence*, Employer's liability.    *Railroad.*

It is not evidence of negligence on the part of a superintendent of the repair shop of a railroad company, that before leaving certain workmen in charge of a pair of wheels of a locomotive engine attached to an axle which had been taken from an engine for repairs he had failed to provide something with which to block the wheels when the workmen wished to stop them or keep them in a particular position on a track, if it appears that the workmen in the shop were accustomed to use for blocking the wheels what they called " scrap ", consisting of pieces of wood or board or anything that came handiest to put under a wheel to block it, and that anything would have done for the purpose at the time in question.

It is not the duty of a railroad company maintaining a repair shop for its locomotive engines, nor of its superintendent in charge of the shop, to warn a workman employed there as a helper to assist the engineer, that a pair of wheels of a locomotive engine attached to an axle, weighing about seven thousand pounds, which have been taken from the engine and are on a fall table in a pit used for the purpose of taking off wheels and replacing them, if put in motion on a track on the fall table cannot be stopped quickly and will have considerable momentum, and that it is unsafe for a workman after such wheels are thus in motion to take a position against a corner of a recess in a wall of the pit where a crank pin attached to the outside of one of the wheels may strike him.

TORT for personal injuries incurred by the plaintiff on February 9, 1901, while in the employ of the defendant in its repair shop at Norwood, by the rolling against him of a pair of driving wheels of a locomotive engine attached to an axle which had been taken from the engine for repairs and were on a fall table in a pit, the first count alleging a failure properly to warn and instruct the plaintiff concerning the risks and dangers of his employment, the second count alleging that the fall table was in a defective and unsafe condition, the third count alleging a defect in the ways, works or machinery of the defendant, the fourth count alleging negligence of a person in the service of the defendant exercising superintendence, whose sole or principal duty was that of superintendence, and the fifth count alleging negligence of a person who in the absence of the de-

fendant's superintendent was acting as superintendent. Writ dated April 22, 1901.

At the trial in the Superior Court before *Sherman,* J. the following facts appeared, among many others:

The repair shop where the plaintiff worked was called the "setting up" shop. The work done in this shop consisted of all kinds of repair work on locomotives and the building of new engines. There were six pits in the building and there was a fall or drop table connected with one of these, which was run by some gearing, having a track that connected the fall table with the shop so that a locomotive could come from outside upon the fall table in the shop. It was "a nice, good, light shop all around there." On the fall table there was only one track which ran from the shop out to the turntable outside the building. The pit with the fall table was forty feet long, eight feet wide and eight feet deep. Its use was to take off wheels and put them on; an engine would be put upon the floor of the pit, the track being flush with the entrance from the outside; then the engine would be blocked up on a level with the floor, so that, when the wheels were taken off by reason of the dropping of the table, the engine would remain where it was.

Just before the plaintiff was sent to do the work at which he was hurt, Olson, the superintendent, gave him a job and he went around the shop looking for a scraper. The men that he asked said that they had none and told him to get an old file and take it up to the grindstone and file it, and that it would scrape the frame around the engine. He expected to scrape off the grease and rust with it. Then Olson came after him and told him to go over and assist Nash, the engineer, in putting the wheels on the engine. At that time Olson said, "Hello, Duffy, go over and give Nash a hand at the wheels on the engine"; that was all that was said. Then the plaintiff went over to the right hand side of the engine, facing toward Boston, and leaned up against it, that is, he lay up against the engine upon the right hand side of the pit where he was going to work to put the wheels on. One Bowen was there. Nash said to the plaintiff "Hello, Frank, come over here." When the plaintiff went over, Nash called over Bowen also and told the plaintiff to get down into the pit. The plaintiff got down into

the pit as he was told, and Nash sent Bowen after the blocks. Bowen came back and said he could not get any blocks in the shop and Nash said, " Well this job must be done before dinner; come on out of here." The plaintiff described what happened then as follows: " So I went up on my wheel on the right hand side and she started and I had my right shoulder up against it and it come and it come and it come harder. It gave me one rap and I passed the wheel and it come against me and the sight left my eye." The plaintiff " was standing inside the rail; his right shoulder was up against the wheel, facing towards the wall."

The following also is from the testimony of the plaintiff:

" *Q.* Now, had you ever done anything before that in the way of moving or pushing or stopping the wheel of that kind? *A.* No, sir.

" *Q.* Had anybody explained to you or said anything to you rather in regard to the manner in which you should work at that wheel, in assisting the moving of the wheel? *A.* No, sir.

" *Q.* Have you stated all that Mr. Nash or Mr. Olson said to you in regard to that work of helping move the wheel? *A.* No, nobody told me anything about how to work.

" *Q.* Had you at any time before that noticed how they stopped the wheel or moved the wheel in particular? *A.* No, sir.

" *Q.* Up to that time had you learned from any source what a counterbalance was? *A.* I never knew what it was.

" *Q.* What its purpose was? *A.* No, sir.

" *Q.* Had you observed or had your attention been called in any way to the effect of a counterbalance on a wheel after the connecting rod had been taken away? *A.* No, sir.

" *Q.* Did you know anything about the machinery of a locomotive? *A.* No, sir.

" *Q.* Did you receive any instructions or information at all from Mr. Olson or from anybody else connected with the company and the company's work there as to the possibility of injury, the machinery, the working of the wheels, weight of the wheels, amount of force it required to control the wheels and the dangers to be guarded against in relation to the machinery and the wheels about there? *A.* No, sir."

The following explanation of the accident is taken from the plaintiff's brief:

"At the time of the work in question, the crank pins were in these wheels, but the nuts and bolts and all the connecting rods had been removed from the crank pin. The crank pin extended over the platform on which the men worked so as to come within one and one half inches from the side of the pit, and on the other side of the platform was a pit in the fall table nineteen inches deep which was filled with water. On either side of the floor pit to a depth of eight feet there were side recesses or holes in the wall of the pit, sixteen by fourteen inches wide, where the screws go in to raise the whole table.

"The wheels in question were to be rolled from their position forward on the rails to the end of the pit under the body of the locomotive.

"At this time, owing to the removal of a part of the rods, bolts and nuts against which the counterbalance was weighted, the counterbalance operated as a separate weight at the rim of the wheel, so that when such weight passed over the top of the wheel in its motion forward and downward it operated as a force to accelerate the motion of the wheel, and it was this accelerated motion which caused the injury of the plaintiff. . . .

"The plaintiff, when the wheel came harder upon him, passed by the wheel and was caught by the crank pin and wedged into one of the recesses or holes in the wall, so that he stopped the wheel and was severely injured.

"Nash, the machinist, testified that when they got the wheels going the rear wheels started to follow the main wheels, and witness told Bowen, another helper, to get a block, and he ran back to do so. In the meantime the main wheels were running ahead, and the witness stood with his right shoulder against the left wheel. [The plaintiff was on the right hand wheel and did the same. The first thing the witness knew the plaintiff was hurt. The plaintiff was pinned there and almost slewed the wheels off the track.] The plaintiff was so firmly wedged into the recess in the wall that the eight or ten men could not move the wheels from him, and they were finally pried off by a bar."

Other material facts, including the method of blocking the wheels of locomotive engines in use in the shop and the weight

of the wheels that injured the plaintiff, are stated in the opinion.

At the close of the plaintiff's evidence the judge ordered a verdict for the defendant; and the plaintiff alleged exceptions.

*G. F. Williams,* (*H. D. Crowley* with him,) for the plaintiff.

*J. L. Hall,* (*F. W. Knowlton* with him,) for the defendant.

KNOWLTON, C. J. The question in this case is whether there was any evidence of negligence on the part of the defendant, or of its superintendent.

There was no evidence tending to support the second and third counts of the declaration, in each of which it is averred that the defendant's fall table was in a defective and unsafe condition.

It is contended that there was negligence on the part of Olson, the superintendent, in not providing something to block the locomotive wheels when the workmen wished to stop them or keep them in a particular position; but the testimony was undisputed that the workmen in this shop were accustomed to use what they called "scrap" to block the wheels, that is, pieces of wood, or board, or anything that came handiest, to put upon the track under the wheel to block it. The witness who testified on this point said that anything would have done just at that time. One Bowen had been sent by the machinist to bring something to use as a block, and, if there was any negligence in regard to this, it was the negligence of the machinist and the other men in moving the wheels without waiting for Bowen to return, and not the negligence of the superintendent, who was absent at the time.

The contention most relied on by the plaintiff is that there was negligence in failing to warn him of the danger of getting caught by the crank pin against the corner of one of the holes in the wall at the side of the pit.

It is not contended on the evidence that the construction of the pit was improper, or that any other mode of construction would have been better. It is not contended that, for the safety of an employee who had contracted to work there, the defendant was bound to change the construction of the fall table, or the pit, if another construction would have been safer. The contrary has been decided in many cases.

It is contended that the danger from which the plaintiff suffered was a peculiar one, which, from observation of the place, he would not be expected to discover or anticipate, and which the defendant knew or ought to have known, so that it was the defendant's duty to warn him and instruct him how to avoid it. According to the testimony, the axle and the pair of wheels connected by it weighed about seven thousand pounds. A man of ordinary intelligence could not fail to know that such wheels would start slowly, and that when in motion they could not be stopped quickly. One would know from their size and weight that he could not safely allow them to move up and catch him between them and an immovable wall.

In each wheel there was a counterbalance, occupying a section that included about one eighth of its circumference, which was designed to balance the weight of the crank pin, and of the connecting rod that was attached to it. As the connecting rod had been taken off before the accident, the counterbalancing weight was greater than the weight of the crank pin and its bolts and attachments on the opposite side of the wheel, so that it had a tendency to increase the difficulty of stopping the wheel when its weight was on the part of the circumference that was descending. As the crank pins on the opposite wheels were set at different angles with a perpendicular line, the counterbalances on the two wheels were put on correspondingly different parts of the circumference, so that when one was descending, the other would be going, with the same revolutionary movement, at a point in a line one eighth of the circumference of the wheel away. While their combined effect upon the motion of the wheel was not so great as if both had been at the same point in the circumference, they appreciably affected it in some parts of the revolution. Although this was open to observation on looking at the wheels, whether a helper would be expected quickly to notice it we do not think very important in this case, for in any event he could not fail to know that such wheels, when in motion, would have considerable momentum, and he would be expected to know that it would be unsafe to take a position against a corner of one of the openings in the wall where the crank pin might strike him. Moreover, in moving wheels on

this track that is not a position which one would be expected to take, even if there were no danger attending it. ,

The question is whether the defendant had reason to think that an ordinary person, set to work with several other men in moving locomotive wheels, was in serious danger of putting himself in this position while the wheel was rolling forward in ' a way that would be likely to bring it against him. Unless the defendant's superintendent would have reason to expect this, it was not his duty to warn the plaintiff in regard to it. We see no evidence that a superintendent should have anticipated a possible accident of this kind so as to make it his duty to give helpers instructions in regard to it. Everything in the situation. was open, the place was well lighted, the forces involved were the ordinary forces of nature, operating in an ordinary way upon materials and objects with which, in their essential features, everybody is familiar.

We are of opinion that there was no evidence of negligence of the corporation or of its superintendent in failing to warn the plaintiff of the danger of such an accident as happened to him. See *Goldthwait* v. *Haverhill & Groveland Street Railway*, 160 Mass. 554; *Stuart* v. *West End Street Railway*, 163 Mass. 391; *Ciriack* v. *Merchants' Woolen Co.* 146 Mass. 182.

*Exceptions overruled.*